Q. Mr. Unger, are you leading off? Yes, Your Honor. Thank you. Great. Welcome. Thank you. May it please the Court, I'm Randall Unger. I represent Harvey Christian, and Michael Gold is Counselor of Records for Anthony Christian. Unfortunately, Mr. Gold had a loss in his family last night, and he's attending a funeral this morning. With the Court's permission, I'm prepared to go forward to make arguments on behalf both of the defendants. We submit that the evidence fell short of proving the existence of a racketeering enterprise. Essentially, Anthony and Harvey Christian were selling drugs at and about the apartment building where they lived over a long period of time, and while the government chose to charge them with racketeering and racketeering conspiracy, it did not prove beyond a reasonable doubt that they carried on an enterprise within the definition of that term, even when viewing the evidence in the light most favorable to the government. In effect, the government turned the two brothers, Harvey and Anthony, into an enterprise, labeled them as the so-called Parkville Gang, and then proceeded to charge them over an extremely long time period from the early 1990s up until 2011, and I submit that, in addition to the other deficiencies, there was a period of time between 2001 and 2010 where there was virtually no evidence of any enterprise activity, and while I understand that a period of quiescence may be disregarded, here there was approximately a nine-year gap, a period of inactivity which is far too long to support the conclusion that the so-called enterprise was continuing throughout that time. Well, Mr. Unger, there may be, this is Judge Lynch, sorry, there may be a nine-year gap between predicate acts, but isn't it the case that there in between those two predicate acts? Mr. Unger, are you there? Mr. Unger? Hello, am I audible? Now you are audible, yes, but nothing up until just now. I'm sorry, in response to the last question, I think there was a cooperating witness' testimony that sometime around 2003, he saw Anthony and Harvey Christian selling drugs. I think that was the only reference to that. I think there was testimony about events in 2004 and 2005 and 2007 and 2009, is that mistaken? The 2004, I think that refers to the instance where an individual named Colley, an ex-football player, purchased a $5 bag of marijuana from Anthony Christian. Colley refused to pay the $5, and then an altercation ensued during which he began choking Anthony Christian. Harvey Christian then came to his brother's aid and basically prevented him from being choked to death. So that was the 2004 incident. The 2005, that was where, I forget which of the brothers was in the building, and there was some individuals who were there in the building as well, and the police arrived and were going to arrest the other individuals as trespassers. And then an altercation ensued during which it was a pretty bad commotion. One of the officers was injured. There was no evidence, however, that the government suggested that any of these alleged trespassers had anything to do in a business sense with either Harvey or Anthony Christian. Well, once again, Mr. Unger, I mean, first of all, I guess I'd suggest to you that this may be limited or weak evidence with respect to these activities during the period between 2000 and 2010, roughly. But what you said was there's no evidence, and that, first of all, is not accurate. And you may have explanations for all these things, but aren't these things that, these are jury arguments, right, as to what all of this means? Well, I think what the government's position, at least with respect to the 2005 altercation with the police, is that the Christian brothers were trying to protect drug dealers who were associated with them, and basically there was no evidence of that. And I think the government is asking this court to infer that that was the situation. But, you know, there's a fine line between inference and speculation. And I think the kind of argument that the government uses to support their position, I think, goes into the realm of speculation. Because, in truth, the incidents involving the police, it was bad. It was a violent incident. But what it demonstrates is, I think, nothing more than that the Christian brothers just don't like the police. I don't think it supports the government's intention. With respect to the conspiracy to murder William Jones, also known as Buddha, I submit that that was completely unrelated to the so-called enterprise charged in this case. Now, the government concedes that the dispute between Anthony Britt and Buddha originated as a personal grudge. But more than that, when Britt was cross-examined about the dispute, he asserted that it was purely personal in nature. It had nothing to do with drugs. It had nothing to do with the Christian brothers. It happened that Britt was a friend of Harvey Christian. And I think that the exchange during which Mr. Britt was cross-examined, we quote that on page 40 of our brief, I think that that exchange conclusively shows that the plot against Buddha had no connection to any alleged enterprise and that the alleged plot was purely personal in nature because, in fact, the dispute was originally between Britt and Buddha. And then it transformed into a dispute with the Christian brothers because Buddha had fired shots at their home. So I think that charge was legally insufficient as well. And now we make the argument that cooperating witnesses Humphreys and Ford were essentially incredible as a matter of law and that their testimony could not possibly support the conviction. We acknowledge that there's a high, very high threshold to meet to establish that a witness is incredible as a matter of law. However, I would submit to this court, you cannot turn a blind eye to the manner in which a witness conveys a story to a jury. Humphreys, for example, he reported that he, hello? We're still hearing you. I'm sorry, I was cut off before, so I just wanted to make sure. Humphreys, for example, he reported that he'd heard imaginary voices since he was a child, most likely schizophrenic. But even if you put aside Humphreys' mental capacity and his criminal career, which was truly despicable, involving multiple shootings, his credibility was destroyed by the following admission. He committed perjury to shorten the prison sentence that he was facing. He falsely implicated the appellant's brother, James, in a murder he had committed with another person. He lied to agents when he told them the Christian brothers had paid him to commit a murder. He lied when he stated that during the murder, he was only the driver rather than a shooter. And he lied when he stated that the Christian brothers were involved in another murder because, as he explained it, he thought that's what the government wanted to hear. So wasn't all that brought out in front of the jury? Yes. And the jury could consider each of the items that you just laid out for us? Well, certainly the jury, that's their problem. But, you know, in this case, I would submit that Humphreys' credibility was so destroyed that no rational jury could credit his testimony. That they did is unfortunate, but it doesn't immunize, it doesn't provide the government with any immunization against this court's review of the testimony in support of the conviction. Counsel, this is Judge Newman. You're asking us to find him credible as a matter of law, correct? Yes. That was the phrasing that we used. Has this court ever said that such a ruling can be made? Well, I am acknowledging that it's an extremely high burden on our part. Well, not only high, but I'm wondering, has the court ever said that's even an available position for a court of appeals to take? I cannot cite a decision, but whether or not the court determines that... You'd like this to be the first one? It's always the first one, as they say. But I would suggest also that the other witness we spoke about, Mr. Ford, he was no more credible than Mr. Humphreys. Somebody who committed multiple shootings, murders, told the jury he would have committed more murders, but he just couldn't find the intended victim. His credibility, and in addition, he admitted that he had read a transcript of Humphrey's testimony so that he could tailor the story. Numerous other lies I won't even get into, but I submit on balance, no rational jury could or should have credited the stories told by either of those witnesses who essentially had only one motive for testifying, to shorten their own sentences. Finally, I wanted to address the government's rebuttal information, which I believe denied the appellant their due process right to a fair trial. There's no dispute that the government is entitled to respond to the government's response must be fair. Here, government repeatedly overstepped the bounds of permissible advocacy when it disparaged the defense, effectively accusing the defense attorney of engaging in the tactic of distracting the jury from the relevant evidence. You've tried a lot of cases in the federal courts in this city. How many times have you not heard the government make the argument that the defense arguments were a smokescreen or a distraction from the evidence that the government thought the jury should focus on? Sadly, too many times. It's a very popular, very well-recognized type of argument for prosecutors to make. What's wrong with the argument that you get up and say, here's what's important about this evidence, and the government gets up and says, that's nonsense. That's a distraction. The defense wants you to concentrate on this, but that's not what's important. Here's what's important. I've seen cases where the government does things that are fairly outrageous, like say, this is the way defense lawyers are because they're paid to the interests of justice at heart, and so they're just trying to confuse and mystify you. The role of the defense lawyer is to raise issues that could raise a reasonable doubt, and the government is within bounds, it seems to me, in saying the issues that are raised here don't do that. What they do is distract you or obscure what's really important, and then the jury figures out whether they think it's important or not important. Well, if the prosecutor simply tells the jury, I don't think that's important, or you shouldn't consider that as a significant point, I don't have a problem with that. But when you stand there and point your finger at the defense table and say, these guys are blowing up a smoke screen, kicking up a smoke screen, you're telling the jury, forget everything these attorneys just told you because they're just trying to fool you, they're trying to pull the wool over your eyes. And in effect, what they're saying is, these attorneys are not to be trusted. And that, in turn, reflects upon the client, because if the client has an attorney who's not to be trusted, then the obvious next step is, well, he's not to be trusted either, he wants to appeal. And in any event, in this trial, the defense attorneys weren't blowing or kicking up smoke screens at the jury, they were pointing out why the witnesses were not credible, which is something that I'm stating to the court today. And I don't think making an accusation from disparaging the defense counsel, I don't think that's an appropriate strategy for a prosecutor. I believe it was also improper for the government to argue that the defense counsel had attempted to mislead the jury by misstating a cooperating witness' grand testimony, that he was giving the government all the information they needed. Let's look at what actually happened there. The defense argument was that the first words out of his mouth as to what he wanted to do was to please the government or give the government what he wanted. And the government then got up and read from the transcript. And in fact, the first words out of his mouth were that his job was to tell the truth. And it was only later on cross-examination that he said that some words to the effect of giving the government what it needed. And indeed, the defense might have done better. I'm sure it's just an inaccurate memory on counsel's part. The defense might have done better to say, yeah, when he was rehearsed and telling you what he had prepared with the government, he said, tell the truth. But then on cross, you notice that he slipped up and said what his motive really was. But these are the things that happen in a trial and the government's pointing out that what the defense counsel had said was literally inaccurate is absolutely correct. It was literally inaccurate that the first words out of his mouth on his motives were to give the government what it wanted. It is all tempest in a teapot. Well, I kind of agree with your honor. I don't think it was the most serious impropriety. I think it was far more serious for the government to suggest that that the cooperators should be believed because they didn't know what the other proof would be. The problem with that argument is there was no evidence to support it. We didn't have any testimony. I don't believe most of the cooperating witnesses were not asked the question, did you know which other witnesses would be testifying or did you know what other evidence the government would be presenting in this case? They simply weren't asked that question. So for the government to argue that they didn't know what the proof would be, it just that's not accurate and that's not supported by the record. And I think the government has now taken the position on this appeal as well. This was simply a common sense argument. I don't agree because we're dealing here in a case with highly manipulative and very likely sociopathic witnesses who would do and say anything to achieve a reduction in their sentences. So I don't think it's common sense to make that argument. And finally, in terms of the impropriety, it is improper to argue that the prosecutors and the agents had sought to corroborate what the cooperators said, which suggested that the prosecutors knew they were was also improper. And then finally, the court's instructions at the end of the closing statements that the attorney's arguments are not evident, I submit did not cure the misconduct. This is the kind of generalized instruction that's given essentially in every trial. Well, was there a specific objection to the particular language that you've called attention to here? I don't believe so. So it's a little hard on the judge, isn't it, to say that the judge needed spontaneously to fly spec the statements of each lawyer on both sides and then give specific instructions as to where each one might have gone over a line. What happened was there were vigorous summations and the judge called the jury's attention to the fact that the lawyer's statements are not evidence. But did anyone request a more specific instruction of any kind? No, I don't think so, Your Honor, but all I'm doing now is I'm responding to the government's position, their argument that in some way the court's general instruction that attorneys' arguments are not evidence somehow cured the improper comments made during the rebuttal. Okay, I hear what you're saying. I feel guilty. Not overwhelming. I believe each of them suffered substantial prejudice and a new trial is therefore required. Thank you very much. Yes. Thank you, Mr. Unger. And you have not reserved time for rebuttal. I just want to confirm. All right. Okay. Thank you, Mr. Mayor. Good morning. This is Sean Maher and I represent thank you represent defendant appellant Jason Quinn. I intend to focus on the first two issues raised in Quinn's group that the trial court erred by misconstruing the law of proper waivers and that the government committed reversible Brady violations. Turning to the proper waivers, United States versus Rosemont has bright lines of what situations are not factual assertion sufficient to trigger a proper waiver. Such situations include arguing that the government has not met its burden of proof, cross examining a witness in a manner to suggest that he was willing or mistaken or is not reporting an event accurately, or cross examining a police officer about discrepancies between his testimony and his earlier written report. These actions are all fair game for the defense. The problem here is that the trial court failed to uphold these bright lines and punished Quinn when his counsel acted within the lines of Rosemont. Well, Mr. Maher, that's what I wanted to ask you some questions about. Putting aside for a moment the business with the opening statement, and I realize that's significant, where else in the trial, if ever, did the judge punish defense counsel and or allow the government to introduce any statements from the proper session? The court did not get to the point of allowing the government to put in statements from the proper. The court, though, did find that proper waivers had occurred, specifically in the cross examination of cooperating witness Ford, when defense counsel is the basic type of confrontation that's permissible under Alajuanasola and under Rosemont, pointing out that Ford had earlier in this proper session said, when I saw Quinn, he was mostly by his own, whereas in his direct testimony, he said he saw Quinn with the Christian brothers. The court, when the cross examination was concluded, told defense counsel that a waiver had occurred. Excuse me again, Mr. Maher. We may have brought this on ourselves as a court by saying this is a two-step inquiry, but it seems to me the two steps, if we're looking at any prejudice to the defendant, blend into one. If the court had then gone on and looked at the evidence, and Mr. Quinn had said in the proper sessions exactly what, something that contradicted his testimony specifically, then why wouldn't it have been the case that the government would be allowed to put in that evidence? But instead, when the judge looked at the proper statements, he concluded that there was nothing in the proper statements that contradicted the testimony, and therefore, no contradictory evidence should be allowed in. He rejected the government's arguments that somehow this statement about who, or the question about didn't he previously say only that he had seen, I forget, whatever. But anyway, the cross examination question, the court rejected the government's argument that that statement allowed them to put in some admission that he was really guilty. So I don't see what the problem is in that episode. The problem is that combined with the ruling of the opening statement, then with this specific ruling undercutting defense counsel and telling defense counsel this type of cross examination is not going to be permitted, that led defense counsel to then waive entirely cross examination. But you know, if you think that if you're the defense lawyer, and you think that that's a wrong ruling, don't you have to have the gumption to go on with what you're doing? And if you believe that the judge is wrong, and the judge then allows the government to introduce stuff, then you've got an appellate argument. But if you retreat in the face of the judge's apparent mistaken understanding of law, if that's what it was, then what do you get to appeal? I believe that's the same argument the government made in the Oluwatosola case. And this court rejected that because there is no requirement to make exceptions to rulings. I'm not talking about making exceptions to the ruling. I'm talking about if the lawyer decides, I'm afraid to do cross examination because the judge might erroneously punish me for doing that. That's on the lawyer. And maybe there's a 2255 that what the lawyer should have done was to stand on his correct interpretation of what would constitute a waiver and what wouldn't make his do his cross examination in the right way. And if the judge then allowed evidence in that shouldn't have been allowed in, then that's your appellate issue. But if the Defense Council acquiesces in, you know, I anticipate that the judge is going to rule incorrectly on something and therefore I'm not going to raise evidence that I have or cross examinations that the questions that I have. Why is that reversible error somehow? Why is that not just on the lawyer? Because at that point, the judge had made clear the judge's interpretation of the law. If you go back to what the judge actually said, going back now to the opening statement issue, the judge gave a rather cogent summary, it seemed to me, of the Roseman decision. Now, maybe he misapplied it in that particular case. Maybe he misapplied it or mistook in some in the other case, although I find it a little, again, hard to say that he got it wrong when he went back and didn't allow the government as a result of whatever question had been asked to introduce anything. I'm not sure what error happens there. But going back to the opening statement, if he misapplied it in one instance, I don't see anything that says the judge didn't read or understand Roseman. Judges make mistakes sometimes. But that's different than saying that defense counsel are supposed to cower in the face of their misinterpretations. I think there's a difference between cowering versus not saying the same thing over to a court that has made its position on the law clear. I'm not saying anything about making, you know, this is not a question of waiver by failing to object. This is a question of your saying, your appellate argument is that the lawyer declined to do any cross-examination because he was afraid of what the judge might rule with respect to any cross-examination of either of those witnesses. Correct. Excuse me, you have one minute left. And I think the record bears that out. I think it's similar to what was said by this court in Barrow, and excuse me, in Olajuanasola, that the government's extreme interpretation of Barrow coupled with the court's preliminary ruling that adopted the government's position had the effect of severely limiting the defendant's ability to mount an effective defense. And if you look at the opening statement itself, just before the opening statements were made, the trial court said specifically that the type of argument that would be permissible would be to say, quote, that the government can't meet its burden. And that's on Appendix page 111. And then the trial court then hammered defense counsel for not saying will not, for saying can't, and could not. So I think that the trial court's misapplication of the law was clear at that point, and the prejudice is overwhelming in that it led defense counsel to not cross-examine the key witnesses in the case. I would like to reserve at this point for rebuttal, please. Thank you, Mr. Maher. You have reserved one minute for rebuttal. Ms. Smith? Good morning, Your Honors. May it please the court, I'm Robin Smith for appellant Anthony Britt. Can you hear me okay? Yes, we can hear you. Thank you. Okay, great. There were three errors at Mr. Britt's sentence, and the government agrees with two of them. The government agrees that the term of supervised release regarding the proposed posing danger is unlawfully vague, and the government most importantly agrees that the guideline calculation was incorrect. The guideline calculation that the court relied on was 360 months to life, and the correct guideline calculation was 292 months to 365 months. That's the difference of the minimum sentence of five years, and that's important because Mr. Britt received a sentence because he cooperated of half the minimum guideline sentence. He received a sentence of 15 years, which is half of the 360-month minimum range of the advisory guideline sentence that the probation report calculated, and the government can see if the fact will ruin you. The third error was that the district court characterized and concluded that Mr. Britt's role was as a principal, which is basically the highest level. However, the pre-sentence report assessed his level, not at that high level, but did not propose any role adjustment or leadership role. Excuse me, Ms. Smith. Did the district court apply a role adjustment? No. I'm not sure. This is the one point in your brief that I had some trouble following. The judge said, after hearing the evidence at trial, that Mr. Britt was a significant member of the organization or something like that, right? He was a principal active player. A principal active player. Now, a principal active player is different than an organizer or leader, isn't it? The definition of principal is most important, consequential, or influential. This is a principal, right? He's a leading member somehow. He's an important player. That may or may not be accurate. That's one issue. I suppose you could contest that with the pre-sentence reports finding that he's not an organizer, manager, leader of the organization within the meaning of the guidelines, which the court apparently agreed with because it didn't apply that adjustment. I don't know if you can enlist the pre-sentence report on your side of the judge's characterization. The judge is making a characterization that seems to me is much less specific, much more flexible in its application. So, what you're really taking on is saying the judge was somehow factually mistaken and saying that Mr. Britt was a significant player here. Isn't that right? Well, we don't have to establish that the court was mistaken. We just have to establish that the finding of the court was contradictory to the pre-sentence report and that under Rule 32, the court was required to give notice to the defense. But you see, that's exactly my problem. Why is it contradictory to the pre-sentence report? The pre-sentence report doesn't say he's a minor player and entitled to a negative rule adjustment. So, he is, in the view of the probation department, a full participant. That entitled to, but does not get a plus or a minus. And the judge then did exactly that. He didn't give him a plus or a minus for his role. So, why would you be entitled to notice that the judge is reading the guidelines differently than the pre-sentence report did? Well, the rule requires that notice is given to the defense when the judge finds facts that are a guideline calculation that's different from the pre-sentence report. And did the probation officer say that he was not an important player or was not one of the main guys or anything like that? No. No. However... So, then what fact in the pre-sentence... Could you cite me, I guess, is the best way of asking the question. Can you point me to the language in the pre-sentence report that the judge disagreed with or disavowed or made a contrary finding to? The use of the term principle is the term that alerted us to a little... I wouldn't say nuance is not quite... It's more than a nuance. That is a key word. It's a principle word. It's a highlight word. It's a word that sets off alarms. And the fact that the probation department did not find that Mr. Gritt was subject to the rule enhancement... Excuse me. Our position is divergent. I'm sorry. You have one minute left. Oh, okay. Our position is that divergent and that the court should have alerted the parties to its view on that. I want to just summarize now that the government agrees with at least two of the errors and still is advocating that the court give a limited remand on Mr. Gritt's sentence. And because it's a significant... I'm sorry? Ms. Smith, this is Judge Hall. If we agree with you and give a limited remand and it looks like it's going back anyway because the government has agreed there's a guideline calculation problem, what do we tell the court with respect to the argument you're making now? The argument regarding the rules and the divergent findings? Yeah. What you've determined is the judge's characterization of your client as a principal. What do we say to the district court? Don't use that word? Well, it's the court's use of the word. Thank you for giving me the opportunity to frame my argument. As I said, I don't get to do that often. But if the court was assessing his role as principal, then give the parties the opportunity to rebut that. You've got that opportunity if it goes back for resentencing. I mean, isn't your main point that the government is asking us to just ask the judge whether any of this would have made a difference when in fact the judge never said anything about, here's why I'm giving this man this sentence and it has nothing to do with factor X or factor Y. The judge just applied the guidelines. It's a legitimate inference from what happened that the judge gave a cooperator 50% of the bottom of what the judge thought the guidelines were. So it seems to me it's not at all unreasonable for you to contend that we don't know what the judge would have done with the correct guidelines calculation. So give a full remand for resentencing with the right guideline calculation. And if there is a full resentencing, you're now on notice that the judge thinks that the word principal is an appropriate characterization of Mr. Britt's involvement in this conspiracy. And you or successor counsel, if you don't do district court work, has every ability to argue that that's inaccurate with notice from the very moment of that person's appointment that this is an issue that was raised in this case. So I mean, the real focus here is on should there be a full resentencing, even based only on the two things the government agrees to. And the government is rather stingily insisting on a very limited remand. You've got pretty good responses to that. Yes, I agree. And I would just emphasize that the case that the government relies on is a second circuit case. However, it's unpublished and it's not binding on this court in terms of propriety of a limited remand. And we fully advocate for a full remand. I'll reserve the rest of my time for rebuttal unless there's any other questions right now. You've reserved a minute. So yes, you will have that opportunity for the government, Mr. Trowell. Good morning, Your Honors. Kevin Trowell for the United States. I was one of the lawyers who represented the government at trial below. With the court's permission, I'd like to start with the issue raised by counsel for Mr. Quinn about the proffer statements. And I can address the other questions. I wanted to start by noting the argument that Mr. Quinn's lawyer is making about Olawunasola and the court's erroneous understanding of the case law just isn't borne out by the record here. And in fact, at the beginning of trial, as Judge Lynch, you noted, the defense counsel put in a letter explaining his understanding of the law. The government, this is that appendix, I think Mr. Quinn's appendix 109, agreed that that letter accurately stated the law. And then the court explained its understanding of the law, which was also roughly the same as Your Honor pointed out. In Olawunasola, by contrast, the problem that the court identified and the reason why it took this different approach about sort of overarching chilling effect was because the court expressly told the defendant that he was not entitled under its progeny to challenge the government's, the sufficiency of the government's evidence on a particular element. That simply didn't happen here. And in fact, all of the parties were in agreement about the contours of the law. And as you point out, Judge Lynch, the parties had significant disputes about the application of those principles. But short of saying that the government isn't entitled to make arguments about the scope of the proffer waiver, that itself is not impermissible. You didn't discuss the opening statement issue, Your Honor, but suggested some thoughts about it, Judge Lynch, when you were talking to Mr. Quinn's counsel. And I wanted to address that for a moment because you didn't have a chance to get into the record on it. The government raised this objection to the opening statement, the could versus would or could versus will distinction and suggested that what Mr. Quinn's counsel had said was a blanket waiver that suggested factual innocence. Now, in the... But how can that be right? There are all kinds of reasons why it might be impossible for the government to prove guilt beyond a reasonable doubt. In the case of someone who was factually guilty, for example, the witnesses who might have testified that he was guilty from their personal knowledge died in the interim or became unavailable. And then it would be impossible for the government perhaps on that particular situation to prove guilt. That's not the same thing as saying the man is factually innocent, is it? I think, Your Honor, it's fair to say that the government's position on this particular argument was aggressive. And I very much share the point you're The government raised this issue and Mr. Quinn's counsel said what I meant to say was will not. So there was no point at which Mr. Quinn's counsel said, no, no, no, that's not a waiver, no, no, no, could not, can mean any of these other things. What he said to the court was, I misspoke. The court, I think very reasonably said, okay, well, you've just explained to me that that's not what you intended to say. I think we should fix it in front of the jury. And Mr. Quinn's counsel agreed. Obviously, that argument could have gone a very different way. We could have fleshed out what it meant. Maybe we would have come to a different result had we argued the point. But what ended up happening was just that Mr. Quinn's counsel said, I didn't mean that. And so it short circuited the argument that might have led to the conclusion that Your Honor just offered. And so I think in context with the other issues, I'm happy to discuss the cross-examination of Ford and the camera on the house. But it's another example where, yes, the parties had a difference in application of the court principles, but there was nothing that the district court did that suggested a misunderstanding of what Oluwatosola, Barrow, or any of the other cases Roseman had to say. And also just as a matter of principles of law, you take issue with Mr. Quinn's counsel suggesting that Roseman set right lines about what was and wasn't a trigger. I think what all of the cases say is that the court in understanding the scope of a cross or of a jury address has to assess whether what was said, whether it be by the defendant himself or by his counsel, gives rise to a factual inference. And I suggest to you, Your Honors, that here, I think this is at Quinn's appendix 152 with respect to the Ford cross-examination, the court was very careful. I agree with you, Judge Lynch, that these two inquiries collapsed into one and the court was very careful, even though it sort of separated them into two things and called it a waiver. It really, what it was telling Mr. Quinn and what it told Mr. Quinn repeatedly, entirely consistent with the law was, beware that questions on cross-examination can give rise to factual inferences. That's absolutely true. And where they do, we will consider whether there is something in the proffer statements to rebut that. And the court did that and at no time admitted any proffer statement at trial. And so in the government's view, there's simply no Sixth Amendment violation here. Certainly not one that is, bears any resemblance whatsoever to Oluwatosola, Oluwatosola rather. And for that reason, his argument should... As far as these inferences go, is it the government's position here before us that challenging a witness with prior inconsistent testimony could under any circumstances, so long as that's all that it is. It's, you said this today, isn't it a fact that you never told the prosecutors this in any of your proffer statements? Now that may be true or that may be untrue and the redirect can bring out if it was an inaccurate statement. But if he says, yeah, you're right. I didn't say that, at least in that proffer statement that you're showing me, that that could constitute a waiver that would permit the government to put in what I think was basically being asked that Quinn's already confessed to all these things. Well, I mean, of course, if that is the government's position, then maybe we should be laying down some brighter lines. If your position is Rosemond did not make clear enough that that kind of cross-examination is always permissible and is not something that triggers a waiver. No, the government's position, of course, is not that merely cross-examining a defendant about a prior inconsistent statement, full stop. Meaning you can elicit from the defendant that at some prior time, he said a different thing. Absolutely, that's true. I think part of what is of limited effect, because the reason that that can be an effective cross-examination is because it gives rise to the inference that the thing that the witness is now saying isn't true or is recently fabricated. That's the point. That's what it means to say the man has no credibility. That if he said one thing before and now he's saying something different, you the jury should not believe beyond a reasonable doubt what he's saying here. That's a very different thing than saying what he is saying here is factually inaccurate. It's an attack on whether the jury should rely on this witness's testimony. I completely agree with you, Jefferson. I don't mean to dispute anything you're saying. I agree with that. I think as all of the cases in this line make clear, sometimes the line between an appropriate cross on a prior inconsistent statement and an assertion through cross-examination is very all of the cases acknowledge that. I think the judge here and the government certainly now, and I think at the time, recognized that these cases are a bit difficult to construe. We had a difference of opinion on these things. I think ultimately there was no effect, certainly not anything that gave rise to a deprivation of the defendant's Sixth Amendment right. I absolutely hear your point. The only point that I'm making is, this is in response to something Mr. Quinn's counsel is currently saying, that defense counsel simply didn't do this, and he could have, but I don't know why he didn't do it. It wasn't because the judge told him he couldn't do it. I suspect that in many cases, defense counsel would find this to be a less than effective cross-examination technique because you can't take the next step. I don't know that for a fact, and Mr. Lind obviously isn't here, and so we can't understand why he made the decisions he made. That's also part of the government's point, as your honor was pointing out to Mr. Quinn's current counsel. I would imagine that, I don't want to put any words in Mr. Lind's mouth, but this is something that might come up if there is some effective assistance argument, but not cross-examining witnesses when your position, when those witnesses are, as Mr. Unger pointed out, subject to devastating cross-examination by somebody else, and that somebody else is representing the lead defendants, as it were, in the case. In a lot of these RICO cases, I've seen defense counsel basically not do much of anything during the trial when they're representing a subsidiary player, and then get up in summation and say, hey, remember me? You haven't heard much from me, and that's because you haven't heard much that was of any value that implicates my client, and then rely on the other folks' cross-examination. That's a tactic. It may or may not have been Mr. Lind's tactic. It may or may not have been a wise tactic, but there are tactical reasons why a defense lawyer might do what Mr. Lind did. Yes, government agrees that that's why, your honor, and that is just, as you pointed out earlier, I think a point that's beyond the scope of where we are right now. Fair enough. I'm less concerned, frankly, with the judge's rulings than I am with what seems to me a pattern, I've seen it in other cases, of the government being very aggressive in taking positions about what constitutes a waiver, and really trying to limit what are fair tactics by the defense, and in the process, causing themselves and us a lot of trouble on appeal when we get arguments that sometimes are more persuasive than these, because the judge was led to find a waiver and allow evidence in, and that can lead to a reversal of conviction. I think that the government should rethink a little bit whether it's worth the candle to try to short circuit a fair trial of the defendant by effectively keeping people who've made proffers from ever going to trial. I understand your point, your honor. I appreciate the guidance, and I agree with you for whatever that's worth, and think here, though, we are not in that zone, and based on the record, I think the judge correctly understood the cases, didn't apply them in a way, in spite of the government's aggressive view here, the district court understood the law correctly, did not impose, did not misapply the law, and ultimately didn't introduce any of the statements in a way that prejudiced Mr. Quinn. So I absolutely take your point, and only would just offer that I don't think it strictly applies here because the judge correctly understood the law. If I could just briefly turn, I'm obviously happy to address any of the other arguments that Mr. Quinn focused on that one. If there are others, I'm happy to address those as well, or to turn briefly to the argument made by Mr. Britt's counsel. I think the only reason the government sought a limited remand here, and I take your point on this as well, Judge Lynch has obviously nothing improper with sending it back for a full de novo review. The government's view simply is out of respect for the district judge who obviously heard Mr. Britt's testimony, considered his criminal history, considered the government's letter in support of his cooperation, that a limited remand to ask would this matter in the first instance is somewhat more respectful of the work he put in the first time around. Well, I agree with that point, Mr. Trowell. I just put to you that there's a difference in anybody's mind, it seems to me, between saying at the time when you're doing it that, well, there are a lot of arguments here, but the sentencing guidelines don't really matter much to me. This is a cooperator and we're trying to deal with it in a certain way, and here's what I think is the right sentence, and then being asked after the fact, would this have made a difference to you if it had gone differently? The latter is a much more difficult question for anyone to ask hypothetically and without any evidence in the contemporaneous record that the sentencing guidelines just didn't matter. When you're faced with a situation where trying to do these sentencing, it's not a science, contrary to the people who invented the idea of guidelines, it's not a science, and when you're trying to assess, here's somebody who did some very bad things, so he deserves a serious sentence, but he also deserves a reward. How do you figure out what's the right number? Here, it seems to me, maybe coincidentally, but maybe not, the number the judge came up with was a 50% discount from the bottom of the guidelines. Maybe it did matter, and maybe we should just let the judge, particularly given that there are some other things that need to be fixed up or whatever, just have a resentencing. It's not an insult to the district judge. I don't disagree with that, and I'm not sure there are other things to be fixed up. I think the government's view is that the factual assertion that Mr. Britt's current counsel relies on was simply the district court's explanation for its sentence. It wasn't a factual error that would or should be corrected, but I hear your point. I think I would just offer that Mr. Ford also, I believe, received a sentence of 15 years. I think it's just as likely that the court took account of the cooperators and their criminal history, and their value of their testimony, and so on, and believed that that was a correct number, but I don't dispute what you're saying, Judge Lynch, that if your honor feels that a de novo resentencing short circuits the issue that you've identified, there's no reason not to do it. We just wanted to offer the idea that it was more respectful to the court, in our view, to ask him first. I haven't been timing you. You may be over your time. If you don't mind, I did want to ask one question about, if the presider doesn't mind, I should say. I'd like to ask one question about the Buddha episode, Mr. Unger's point. This call has another six minutes or so, as I, or five and a half minutes, so carry on. Okay, good. So, about Buddha, I've seen a lot of these cases, of course, we all have, where there are episodes that originate as personal beefs and turn into defending turf, or defending one's reputation, or something like that, but in many cases, and most of the ones I've seen, the government elicits evidence from somebody, including cooperators, who are usually perfectly happy to provide such evidence, that that's what happened. Yes, this started out as a fight about a girl, but when you're in the position of a gang leader, you can't allow people to trespass on your girlfriend, because that's an insult to you as a gang leader, and that's why it was necessary to retaliate here. It wasn't just a personal beef. Isn't Mr. Unger correct that there is no such testimony, not from Mr. Britt, not from an expert witness, or an agent saying, here's how gangs work? There's nothing in the evidentiary record that attests to this purported fact that what starts as a personal beef reaches a certain level where it becomes a gang thing? Well, I don't think, I think in this case, the question, because Mr. Britt explained, and the government doesn't dispute, that it originated as this personal issue, but the people who would know why they had to do it would be Harvey and Anthony Christian, who were not available to testify on that question, so what we had was the inference that can be drawn from the way this transitioned from a personal beef involving primarily Mr. Britt into one in which the person on the other side of that beef, William Jones, was shooting at both Mr. Britt and Harvey Christian. Harvey Christian then said, I'm going to kill him, and then enlisted Anthony Christian to assist, and a fourth person, and so the inference that the government urged the jury to draw was that because of the connection between the Christians and Mr. Britt, which was both through the enterprise itself, which was centered around 55 Bowen, Mr. Jones was firing shots at the front of 55 Bowen, also the enterprise increased its ability to obtain drugs, get lower prices, and so on, protection through its joining the set of Valentine Bloods that Mr. Britt led at the time, that those two relationships quickly transformed this from something that was a very basic personal beef into one that suddenly there were four people driving around the neighborhood looking to kill Mr. Jones. So that's the inference that you're relying on for how the jury could find beyond a reasonable doubt that this was connected to the overall gang or narcotics enterprise? The inference, yes, I think the inference that we asked the jury to draw is that the way that it transitioned from a personal beef into Mr. Christian wanting to kill him, enlisting Anthony Christian, and then enlisting a fourth person driving around Park Hill, and in fact, I think among the more people that Mr. Jones then came to 55 Bowen, Mr. Britt didn't live at 55 Bowen. The shots, you know, if Mr. Jones was looking for Mr. Britt to kill him, shooting at 55 Bowen sort of is a little bit of a myth because that's where the Christian Brothers, that's where their enterprise operated, that's where they sold drugs. So the beef turned very quickly from one in which Mr. Jones wanted to kill Mr. Britt or shoot Mr. Britt into one where Mr. Jones is now firing at effectively the stronghold or the headquarters of the enterprise. And in the government's view, that's a very strong inference that it's now an attack on the enterprise and being perceived as such that leads then the four men to go out looking to kill Mr. Jones. And I have one question since I've got you on the on the hook here about the summation or I guess it's the rebuttal summation. One of the things that was said was we have the burden of proof. The defendants chose these men and here's what's troubling me. But we chose to call them as witnesses and present their testimony to you. And we did that because we believed that their testimony was important. It was probative. It provided you with a full sense of who these defendants are, what they did and what they're about. And then skipping just one sentence, at every turn when a cooperator told us something, agents and prosecutors went back and said, what can we do to corroborate what we've been told? How can we establish that what we're hearing is actually true? And now, there's always a thin line in these vouching cases. That's one thing to say, you heard this evidence which corroborates what these witnesses said. You should believe them not because they're wonderful people, but because we got this evidence that shows that they've been checked out and it checks out because it's corroborated. But there's not much of a reference here to that. There's a reference to we believe these people and we believe them because we did things. After every time we talked to a cooperator, we went out, we sent the agents out to find things. And I don't know that that's anything that's in the record as such. That's telling the jury, trust us because we did the right thing. Why is that proper? Your Honor, I think the point that that bit of the rebuttal was directed at was not merely that the defendants had attacked the credibility of the cooperators in the course of their own summations, but rather that the defense counsel's summations had turned into an attack, in fact, on us, on the trial team. And I would direct the court, there's some of these examples are cited on page 69, footnote 13. Yeah, but I've read everything. I read the entire defense summations. And a lot of what they're saying, frankly, seemed to me like a rather sophisticated argument about what these are people who will manipulate. These are people who will figure out what the government wants. It started with statements that I'm not saying the government is dishonorable in any way. Now, I wasn't there. I have a cold record. I read a speech in Shakespeare's Julius Caesar by Mark Anthony that keeps saying Brutus is an honorable man in a way that makes clear that he doesn't think that Brutus is an honorable man. But on the page, it reads as I'm not blaming the prosecutors, but they got the wool pulled over their eyes by these clever, manipulative, nasty people. And besides that, you notice that the government never ripped up their agreements, even when they were caught in lies. And you know what happens then says defense counsel, then they get the idea that they can get away with stuff. It's like with your kids. If you don't discipline them, they'll walk all over you. That's not saying you're an evil parent who wants them to do bad things. That's saying that what should have happened maybe was to rip up the agreement. But regardless of that, the fact that it didn't helps to account for why the witnesses were able to say the things they said. I don't read that as an attack on the honor or integrity of the government. I read that as an argument that this is the danger that all prosecutors face when they deal with cooperators. The jury gets to make up its mind as to whether it's a much more sophisticated argument than just their thugs and bad guys don't believe them. It's an argument about the psychodynamics of dealing with witnesses. I'd submit to you, if you've never been a defense lawyer and you get to be one someday, that this is informed by what defense lawyers know about what happens when they interview clients. You ask a client, did you do this bank robbery? Oh no, I was never even in that bank. Oh yeah, well look, the government has a picture of you in the bank. Oh yeah, I was there, but I was there for a different reason. Yeah, but in the picture, you've got a gun. Yeah, but I was there with a gun, but that's because I was a lawyer. Every lawyer has dealt with witnesses or clients who are like that, and that's the argument they're making. I understand what you're saying, Your Honor, and I think if the defense counsel's summation had stuck to the summary that you just gave, I don't think we would have had the point to make. But I'm thinking, for example, of, this is one of the courts in the footnote. At what point would the government say- You have one minute left. Okay, thank you. At what point would the government say, I don't care. I don't believe you. I'm not going to put you on the stand as a representative of the United States government and ask a jury to find someone else guilty based upon you because you're offensive, you're a liar, you're disgusting, and you have no conscience. Now, there is probably a legitimate attack on the credibility of the witnesses buried in there, but what's on the face of that is an assertion that the government understood in some way that what they were saying was untrue and nevertheless put them on the stand. So I think the government fairly in rebuttal was entitled to say, look, we take the witnesses as we find them, and they have plenty of works, and we didn't hide from those things. But you can't say that we put them on the stand knowing that they were saying things that were not true and expect us to say, I'm speaking now to defense counsel hypothetically, you, defense counsel, can't make these accusations about what we do and don't know about the witnesses telling the truth, and then expect us not to say anything in rebuttal on that. So the point I think my colleague was making there was that we called them because they are relevant to the case, not because we are out to convict these defendants at all costs, but we called them because we believe them, we work to corroborate them, and that's why we're putting them in front of you. Thank you, Your Honor. If there are any other questions, I'm going to turn it over to Mr. Trowell. Hello? Am I still on? I'm sorry. Excuse me. I keep doing this. I leave myself on mute, and then I said, yes, thank you, Mr. Trowell. That's the first thing I said. Thank you. You have a minute for rebuttal. Thank you so much. I want to go down on the opening statement issue and just highlight the harm that came from this. Mr. Lynn, trial counsel, made a garden variety burden of proof statement. The trial court minutes earlier had said that exact type of statement was permissible under the law. Counsel made the argument. The government aggressively objected, leading the trial court then to issue this instruction to the jury. Mr. Lynn said that government cannot prove its case against Mr. Quinn, but Mr. Lynn wants to prove, which was the appropriate thing to say given his position, is that the government will not prove its case. He did not mean to say cannot. He is saying that it will not. That instruction told the jury that Mr. Quinn was factually guilty. Any reasonable juror took that from them. This trial was over before the first witness was sworn in. I don't know that I even understood what that was supposed to mean or what any juror or any normal person who isn't a lawyer steeped in the mysteries of Rosamond and Buffer statements could possibly make of the difference between could not and will not in these circumstances. More to the point, how do you deal with the government's argument that Mr. Lynn, for good or ill, basically said not the things that you're saying now, but said, I misspoke. I meant to say will not. When the judge said, well, why don't we just tell the jury that that's what you meant to say? He said, sure, fine, do that. Then when the judge said what he said that you might have then objected to and say, oh, that's not what I asked you to say, he didn't do that either. You're saying this is plainly erroneous, that this statement to the jury about what Mr. Lynn meant to say is plain error? Well, I think it's irrelevant what Mr. Lynn meant to say. What he in fact said was lawful. There should have been no instruction. He said it was something that was perfectly fine under the law, so it should have ended there. It didn't matter. Mr. Lynn did object that any instruction would go to the jury, and I believe the trial court said either you say it through your mouth or I'm going to say something. That was the choice Mr. Lynn had to pick at that point. I think Mr. Lynn did object. I think it was highly improper, and I think a regular person hearing this is basically being told, look, these lawyers are going to make their arguments. We know that this guy is guilty, but we're going to continue this game. I think that's what an averager, unfortunately, is going to take from an instruction like this the way it did, and I think the harm is irrefutable. Thank you. Thank you, Mr. Maher. Ms. Smith, you reserved a minute for rebuttal. Yes, thank you. I just wanted to address one comment that Mr. Trowell made regarding the other cooperators. Mr. Britt received a much higher sentence than the other cooperators. Mr. Ford received a 60-month sentence, and Mr. Fields received a 120-month sentence, and it was likely because of the high guidelines range. We would ask for a full remand in light of the huge divergence between the advisory guidelines sentence and the correct one. If there aren't any further questions, we'll rely on the brief. Thank you. Thank you, all of you. We'll reserve decision in this case.